IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILBERT ROGERS, Jr.,

               Petitioner,

   vs.

ROBERT K. WONG, Warden,[*] *et al.*,

               Respondents.

Case No. 2:03-cv-02638 JKS

ORDER

Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges a 2001 judgment of conviction entered in the Superior Court of California, Sacramento County, on one count of burglary, four counts of assault with a deadly weapon with an additional allegation that Petitioner inflicted great bodily injury, one count of kidnapping, four counts of criminal threats, one count of elder abuse, one count of false imprisonment, one count of obstructing a telephone, and one count of being a felon in possession of a firearm. In his Second Amended Petition, Petitioner alleges relief is warranted on the following grounds: (1) ineffective assistance of trial counsel; (2) cumulative effect of trial court error; (3) ineffective assistance of appellate counsel; (4) prosecutorial misconduct; and (5) cruel and unusual punishment. Docket No. 55. Respondent asserts that some of Petitioner's arguments are procedurally barred and that all of the claims fail on the merits. Docket No. 72. Petitioner has filed a Traverse. Docket No. 84 (Trav.). The petition will be denied for the reasons set forth below.

---

[*]Robert K. Wong is substituted for his predecessor pursuant to Federal Rule of Civil Procedure 25(d).

1

# BACKGROUND

In an unpublished opinion filed on September 16, 2002, the California Court of Appeal, Third Appellate District, summarized the factual background of the offense and trial:

We start by identifying the victims of defendant's violent rampage: Elsa Haro is the 78-year-old mother of Rachael Ramirez and the grandmother of Lisa Lindeman. [Footnote 2] Lindeman is married to Jason Pribyl.

[Footnote 2: Lindeman and Ramirez have a number of felony convictions.]

On August 27, 2000, Lindeman and Pribyl were staying with Ramirez in apartment 505 of an apartment complex. Lindeman had been staying there for four days and was helping her mother move out. Lindeman's two children, Amanda M. (12 years old) and Sara (11 months old), were staying there too. Lindeman's nephew Justin J. (13 years old) and her niece Lena A. (seven years old) also lived with their grandmother in apartment 505.

DeLena Robinson lived two doors down in apartment 507. Robinson's 14-year-old daughter, Jodee L., and her 22-year-old nephew, Kenji Taylor, also lived with her in apartment 507.

According to Robinson, defendant was her boyfriend [Footnote 3] between 1995 and February 2000. During defendant's incarceration, Robinson visited him in jail almost every week. In early January 2001, Robinson told the prosecutor she and defendant were still dating and in fact had recently become engaged. Robinson approached the district attorney a short time later to tell him she had actually broken up with defendant in February 2000. Robinson claimed defendant lived with her in apartment 507 from 1997 to February 2000. A DMV registration with defendant's name, however, suggested he lived at apartment 507 after February 2000. Even as late as the trial date, defendant continued to receive mail at apartment 507.

[Footnote 3: Throughout the transcript, Lindeman and Amanda M. identified Robinson as defendant's "wife." Defendant often referred to Robinson as his wife.]

In August 2000, tension was high between the residents of apartments 505 and 507. The parties stipulated that on August 21, 2000, Jodee L. reported to the police that the night before, she had been the victim of unlawful sexual intercourse perpetuated by Justin J. and two other male juveniles. In addition, two weeks prior to the incident at issue in this case, defendant told Lindeman's mother, Ramirez, that Justin J. had stolen $ 2,000 worth of stereo equipment from defendant's car.

We now turn to the events of August 27, 2000. Late that evening Lindeman noticed defendant standing outside of apartment 507. Lindeman had seen defendant five or six times prior to this night. Defendant and Robinson gave Lindeman a dirty look. Lindeman hurried into her apartment.

A couple of minutes later, defendant knocked on the door of apartment 505. Amanda M. opened the door and defendant pushed his way in. Lindeman returned from the kitchen and saw defendant in the threshold with the door shut behind him. Defendant was angry and yelled where "the fuck" was Justin J. and Justin J.'s uncle. Lindeman told defendant she "wasn't fucking" going to tell him.

Defendant pulled out a gun and grabbed Lindeman by the throat and stuck the gun in her face. For about 15 to 20 seconds, defendant squeezed Lindeman's throat tight enough to cut off her air supply.

At this point, Amanda M. grabbed baby Sara and ran up the stairs. Defendant pointed his gun at Amanda M. and ordered her to come back down. Amanda M. continued up the stairs. Lindeman started pushing defendant and defendant hit Lindeman in the face six to eight times with his gun until she fell down. He was calling Lindeman a "fucking bitch" and demanding to know where Justin J. was. Lindeman screamed for her husband, Pribyl, and her mother, Ramirez. During his tirade, defendant referred to himself as their neighbor and the "shit [that] lives two doors down from you."

Haro tried to push defendant away from Lindeman. Defendant, however, kept hitting Lindeman and moving her toward the stairs. Defendant said he told the victims "about that little bastard, I fucking told you about that little bastard."

As Lindeman's husband, Pribyl, came running down the stairs, defendant hit him in the face with the gun. Next, Lindeman's mother, Ramirez, came down stairs, and defendant hit her in the head too. Defendant repeatedly shouted he was going to kill all of them.

At this point, Lindeman went into the kitchen, grabbed the phone and called 911. Before the 911 operator could answer, defendant ordered Pribyl to get Lindeman "fucking" in here and "bring me the fucking phone." Lindeman watched defendant hold the gun to her mother's face.

Pribyl grabbed the phone from Lindeman, unplugged it and brought it back to the living room to defendant. Defendant took the phone and put it in a wardrobe box. [Footnote 4] Defendant continued to point the gun at the victims in the living room.

[Footnote 4: Ramirez claimed Pribyl put the phone in the box.]

Defendant ordered the victims to get down on their knees and defendant hit Pribyl and Lindeman's mother, Ramirez, in the face and head with the gun as they were going down. Lindeman estimated defendant hit Ramirez 8 to 15 times. Defendant struck Haro twice.

While defendant was beating his victims, he was telling them "that little bastard Justin [J.], he took my daughter's virginity." Defendant also claimed his stereo was stolen out of his truck. As he beat Ramirez, defendant said, "this is for having that little bastard[, y]ou stupid fucking bitch. I talked to you about him and you didn't do a fucking thing. Him and his fucking friends stole $ 2,000 worth of stuff out of my truck, and now he takes my daughter's virginity."

Haro tried to stop defendant, and he hit her and ordered her to get into "this fucking closet" -- referring to a bathroom. Dazed, Haro walked around in a circle for a minute, and defendant hit her again. Then, as ordered, Haro went into the bathroom. Defendant kept yelling he was going to kill everybody and claimed Justin J. had raped his little girl.

Defendant ordered Lindeman to come over to him. She did. Defendant grabbed her and ordered her to the front door. Defendant then told her, "I want you to go down there and get them," pointing toward apartment 507. While defendant was distracted, Haro, Ramirez, and Pribyl ran out the back door to a neighbor's to call the police. Haro told the 911 operator the perpetrator of the crime lived in apartment 507.

While defendant remained outside of apartment 505, Lindeman went down to apartment 507 and knocked on the door. Lindeman begged the girl who opened the door to come down to see what defendant was doing so defendant would stop beating Lindeman's family. Lindeman saw defendant's "wife," daughter and son in the apartment. The daughter said defendant was not her dad and ran back up the stairs. Defendant's "wife" shut the door in Lindeman's face. Lindeman knocked again and begged the wife to come out.

Next, defendant told Lindeman to "get the fuck down here." Lindeman refused, and defendant went up to her, hit her with his gun about six times and then dragged her by her hair back to apartment 505 -- a distance of about 40 feet. When they got back into the apartment, all of the adults in Lindeman's family were gone. Defendant put the gun to the back of Lindeman's head and ordered Lindeman to get her family back.

At this point, defendant backed out of the apartment and left. As he left, defendant told Lindeman, "you fucking call the cops, bitch, me and my boys will come back and kill your whole fucking family. I fucking mean it." Lindeman agreed not to call the cops, shut the door, and locked it. Lindeman found the children upstairs crying.

Defendant nonchalantly walked back toward his apartment. When the police arrived, Lindeman shouted to them where defendant was. The police, however, did not capture him that night.

Defendant was arrested about two weeks after the assault at the home of Anita Lofton -- defendant's sister. Defendant ran out the back door when the police arrived and the police found him hiding behind garbage cans around the side of the house. The officers noticed a luggage bag on the floor and a pile of clothing on the couch. Lofton told the officers the bag belonged to defendant.

At trial, Detective Daniel Cabral testified Lofton told him that defendant ran out the back of her house when the police arrived to arrest him. Cabral also testified Lofton told him defendant was going to Florida because he was in trouble. Cabral testified Lofton told him defendant admitted he used a gun and hurt someone at the apartments where his girlfriend lived in a fight concerning a burglary and the victim of a sexual assault. Also, Cabral testified Lofton said defendant believed he was going to jail. Cabral also testified Lofton told him defendant owned a gun that Lofton kept in her home.

Detective Cabral interviewed defendant's girlfriend, Robinson, on September 15, 2000. Cabral testified Robinson told him a woman had come to her door the night of the crimes claiming that someone was going to hurt her or kill her. Cabral also testified Robinson told him defendant had been living at her house about three weeks prior to the interview and that defendant thought he was in trouble.

Both the statements from Lofton and Robinson were contained in two supplemental police reports that were prepared in September 2000, but not turned over to the defense until January 10, 2001 -- during the trial. At trial, Lofton and Robinson denied making these incriminating statements to Cabral. Lofton did admit telling the police defendant was going to make a career move and was going on a vacation to Florida.

In court, Lindeman, Ramirez, Haro, Pribyl, and Amanda M. positively identified defendant as their assailant, although prior to a lunch break, Haro could not identify defendant as her assailant when asked.

By information, the People charged defendant with burglary (§ 459; count one); four counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts two, five, nine, and eleven) each with an allegation defendant inflicted great bodily injury upon the victim ( § 12022.7, subd. (a)); one count of kidnapping (§ 207, subd. (a); count three); four counts of criminal threats (§ 422; counts four, eight, ten, and thirteen); one count of elder abuse ( § 368, subd. (b)(1); count six); one count of false imprisonment ( § 236; count seven); one count of obstructing a telephone ( § 591; count twelve); and one count of being a felon in possession of a firearm ( § 12021, subd. (a); count fourteen). The People also alleged enhancements under section 667, subdivisions (a), and (b) though (i), based upon six prior felony convictions. The defendant did not testify.

> The jury convicted defendant on all of the counts charged in the information and found the allegations defendant inflicted great bodily injury were true. ( § 12022.7, subd. (a).) The court found four of the prior conviction allegations to be true. The trial court sentenced defendant to 122 years to life in state prison. . . .

*People v. Rogers*, No. C038399, Slip op. at 2-9 (Cal. Ct. App. September 16, 2002) (available in the record as Lodged Document No. IV) (internal citations omitted).

Petitioner timely appealed his conviction, arguing that relief was warranted because the prosecutor committed misconduct during rebuttal; the trial court failed to bar evidence not timely disclosed; the evidence was insufficient to support the convictions for kidnapping and obstructing a telephone line; and his sentence constituted cruel and unusual punishment. The Court of Appeal affirmed Petitioner's convictions in a reasoned opinion filed September 16, 2002. *Rogers*, No. C038399, Slip. op. at 28. The Supreme Court of California denied review without comment on December 11, 2002. *People v. Rogers*, No. S110907 (available in the record as Lodged Document No. VI). Petitioner thereafter filed three applications for post-conviction relief with the Supreme Court of California. Lodged Document Nos. VII (Pet. filed Nov. 7, 2002); IX (Pet. filed Oct. 20, 2003); XI (Pet. filed April 5, 2005). The first two applications were denied without comment. Lodged Document Nos. VIII; X. The following citations were included in the denial of the third application: "(*See In re Waltreus* (1965) 62 Cal.2d 218 [42 Cal. Rptr. 9, 397 P.2d 1001]; *In re Clark* (1993) 5 Cal.4th 750 [21 Cal. Rptr. 2d 509, 855 P.2d 729]; *In re Robbins* (1998) 18 Cal.4th 770, 780 [77 Cal. Rptr. 2d 153, 959 P.2d 311]; *In re Miller* (1941) 17 Cal.2d 734 [112 P.2d 10]; *People v. Black* (2005) 35 Cal.4th 1238 [29 Cal. Rptr. 3d 740, 113 P.3d 534].)".

## LEGAL STANDARD

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. *See Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). A federal writ is not available for an alleged error in the interpretation or application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000); *Middleton*, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues *de novo*. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972).

Because the instant petition was filed after April 24, 1996, any claim therein that was adjudicated by a state court on the merits is governed by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See*

*Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

Where a state court has adjudicated the merits of a petitioner's claim, this Court, under AEDPA, may not grant relief unless the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id*. To qualify as "unreasonable," it must be objectively unreasonable, a substantially higher threshold than merely incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1939 (2007).

Clearly established federal law refers only to the holdings of the Supreme Court's decisions in effect the time of the relevant state-court decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006). In the absence of an applicable holding of the Supreme Court, it cannot be said that a state court decision is contrary to or an unreasonable application of clearly established federal law. *See id*. at 77; *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009). Finally, even if the AEDPA standard is satisfied, the Court cannot grant relief unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *Fry v. Pliler*, 127 S. Ct. 2321, 2326-27 (2007) (*Brecht* standard continues to apply after enactment of AEDPA).

In applying this standard, a federal district court looks to the last reasoned state court decision as the basis for the state court judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). The Court presumes that the state court's findings of fact are correct, unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Where a state court has "silently denied" a claim on the merits without explaining its *ratio decidendi*, a district court independently reviews the

record to determine if the denial was an unreasonable application of clearly established federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000); *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006).

## DISCUSSION

I.  Ineffective Assistance of Trial Counsel

Petitioner alleges that his trial counsel provided ineffective assistance when he allegedly failed to:  (1) challenge the information; (2) obtain pretrial discovery; (3) file a formal discovery motion; (4) call witnesses; (5) challenge the arrest warrant; (6) impeach prosecution witnesses; (7) advise against waiving jury trial on the issue of prior convictions; and (8) request an election. Respondent contends there is no merit to Petitioner's ineffective assistance claim.  This claim was denied by the Supreme Court of California with reference to several cases invoking procedural bars, such as timeliness.  *See* Lodged Document Nos. XI - XIII.  As it appears the California Supreme Court denied the petition for review on procedural grounds, this Court reviews Petitioner's claim *de novo*.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

To demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  *Id*.  Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

*1. Alleged Failure to Challenge the Information*

Petitioner asserts that his trial counsel should have challenged seven of the fourteen counts after the prosecution failed to produce sufficient evidence at the preliminary hearing.  Specifically, he alleges there was insufficient evidence for the kidnapping of Lindeman (count 3); elder abuse of Haro (count 6); false imprisonment of Haro (count 7); criminal threat against Haro (count 8); criminal threat against Ramirez (count 10); obstruction of a telephone line (count 12); and criminal threat against Pribyl (count 13).

7

A probable cause determination is not a constitutional prerequisite to the charging decision. *Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975). As Petitioner's argument sounds only in state law, it is not cognizable on habeas review. *See Estelle*, 502 U.S. at 67-68. Even if Petitioner's claim had constitutional dimension, a review of the transcript of the preliminary hearing reveals that there was ample evidence to meet the low probable cause standard that applies to holding orders under California law. *See* Cal. Penal Code § 872.

For a holding order on kidnapping, the prosecution was required to show that Petitioner "forcibly, or by any other means of instilling fear" held Lindeman and "carrie[d] [her] . . . into another part of the same county." Cal. Penal Code § 207(a). The prosecution presented testimony at the preliminary hearing that Lindeman told police that Petitioner forced her out the front door of her apartment at gunpoint and made her go to apartment No. 507. Clerk's Transcript ("CT") at 54. After Lindeman went to apartment No. 507, Petitioner then forced her back to her own apartment by grabbing the back of Lindeman's hair and dragging her across the ground. CT 55. This was clearly sufficient to support a probable cause holding order on the kidnapping count.

For a holding order on elder abuse, the prosecution was required to show that Petitioner "kn[ew] or reasonably should [have] know[n] that [Haro] is an elder or dependent adult and [], under circumstances or conditions likely to produce great bodily harm or death, willfully cause[d] . . . or inflict[ed] thereon unjustifiable physical pain or mental suffering. Cal. Penal Code § 368(b)(1). For a holding order on false imprisonment, the prosecution needed to show that Petitioner unlawfully violated Haro's personal liberty. Cal. Penal Code § 236. The prosecution presented testimony at the preliminary hearing that Haro told police that she was 78 years old at the time the person identified by others as Petitioner ordered her into a closet and hit her in the head with a pistol when she did not comply fast enough. CT 30-33. Closing the wound to her head required two stitches. CT 45. There was clearly probable cause for elder abuse and false imprisonment of Haro.

For a holding order on obstruction of a telephone, the prosecution was required to show that Petitioner "unlawfully and maliciously" obstructed a telephone line "or appurtenances or apparatus connected therewith, or sever[ed] any wire thereof." Cal. Penal Code § 591. The evidence presented, showing that Petitioner ordered Pribyl to disconnect the phone line, clearly established probable cause for a holding order. CT 46-47.

8

For a holding order on criminal threats, the prosecution was required to show that Petitioner:

> [W]illfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety.

Cal. Penal Code § 422. The testimony at the preliminary hearing clearly provided probable cause to believe that Petitioner had made criminal threats against Pribyl, Haro, Ramirez and Lindeman.

Contrary to Petitioner's assertion, the evidence presented at the preliminary hearing was clearly sufficient for a probable cause holding order on all counts. Thus, counsel's failure to challenge the sufficiency of the evidence for the holding order did not constitute deficient performance.

### 2 & 3. Alleged Failure to Obtain Pretrial Discovery

Petitioner alleges that his trial counsel failed to file a formal discovery motion or affirmatively seek pretrial discovery. His complaint apparently centers on two supplemental police reports that were not disclosed until after trial had begun. Although the issue of ineffective assistance of counsel was not before the Court of Appeal, it made several relevant factual findings in its discussion of Petitioner's claim that the trial court erred by admitting the tardy evidence. First, the prosecutor was obligated by statute to turn over the reports at issue even absent a motion from defense counsel. *See Rogers*, No. C038399, Slip op. at 15-16; Cal. Penal Code § 1054.1. Second, contrary to Petitioner's allegation, the Court of Appeal found that counsel requested discovery from the prosecution in November 2000 -- well in advance of the trial. *Rogers*, No. C038399, Slip op. at 13. Third, when the tardy police reports were disclosed, counsel moved for exclusion of the evidence. *Id*. at 14. Counsel's performance was clearly not deficient under *Strickland*.

### 4. Alleged Failure to Call Defense Witnesses

Petitioner submits that his counsel failed to call three "vital" witnesses: Robin Baily; Chaliah Ware; and Jodee Landrum. According to Petitioner, Baily, the apartment manager, would have supported his third-party culpability defense by testifying to the "illegal activity and drug traffic connected to the victims in this case." Landrum, Petitioner's daughter, and her sister, Ware, would have apparently corroborated Baily's observations. Petitioner's claim fails for several

reasons. First, Petitioner has simply failed to support his general allegations with a statement of specific facts. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (""[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"")). Second, Petitioner has not supported his allegations with evidence that the identified witnesses would have provided favorable testimony. *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000). Petitioner has failed to show counsel's performance was deficient in this respect.

### 5. *Alleged Failure to Challenge the Arrest Warrant*

Petitioner alleges his counsel was ineffective for failing to challenge the arrest warrant. Although far from clear, it appears Petitioner's only grievance is that the identity of the confidential informant who supplied the information for the warrant was never revealed. However, Petitioner has failed to even allege what information the informant provided or why revelation of the informant's identity was legally required. *See Jones*, 66 F.3d at 204.

### 6. *Alleged Failure to Impeach Prosecution Witnesses*

Petitioner submits that counsel rendered ineffective assistance by failing to object to the trial court's exclusion of evidence of Lindeman's and Ramirez's prior convictions. Petitioner's assertion is patently false. The trial court ruled that the prior convictions could come in if the witnesses testified. Reporter's Transcript ("RT") at 7-8. Lindeman's and Ramirez's priors were brought to the jury's attention on direct examination. RT 194, 358. Petitioner's counsel argued during closing argument that their criminal priors detracted from their credibility. RT 1150. Accordingly, the Court finds that counsel's performance was not deficient and that Petitioner suffered no prejudice therefrom.

### 7. *Alleged Failures Regarding Bench Trial on Prior Convictions*

Petitioner alleges his trial counsel rendered ineffective assistance by: (1) convincing him to waive a jury trial on the issue of his prior convictions;[2] (2) failing to argue that some of the "strike" priors were unconstitutional; and (3) arguing that Petitioner should be sentenced to 125 years to life. First, Petitioner has failed to explain how the prior convictions were unconstitutional. His

---

[2]Petitioner notes that his waiver cannot be found on the record. However, he has argued only that counsel was ineffective for advising him to waive jury trial for the priors.

conclusory allegations are insufficient. *See Jones*, 66 F.3d at 204. Second, Petitioner has failed to explain how waiving the jury trial on the prior convictions was not sound trial strategy. It is incumbent upon Petitioner to show that such a decision was not sound trial strategy. *Strickland*, 466 U.S. at 689. Third, the record reveals that there was significant evidence establishing Petitioner's strikes. Counsel made the best argument she could. She asked the court to consider in mitigation the Petitioner's inflamed passions based on the rape of his step-daughter. She also asked the court to treat certain of the priors as one strike thus reducing the required sentence from 325 years to life to 125 years to life. RT 1318. Accordingly, the Court finds that counsel's performance was not deficient and that Petitioner suffered no prejudice therefrom.

### 8. Alleged Failure to Request an Election

When the evidence tends to show a larger number of criminal acts than have been charged, a conviction will be upheld under the California Constitution only if either the prosecution selects the acts relied upon to prove the charges or the jury is given a unanimity instruction. *People v. Russo*, 25 Cal. 4th 1124, 1132 (2001). Petitioner argues his counsel was ineffective for failing to request that the prosecutor select the acts upon which each count was based. Any failure to request election was made harmless by the trial court's unanimity instruction. *See* CT 186; *Russo*, 25 Cal. 4th at 1132.

## II. Alleged Errors of the Trial Court

Petitioner alleges that the trial court erred when it: (1) excluded third-party-culpability evidence; (2) permitted the jury to ask questions; (3) assisted the prosecution; (4) failed to instruct on lesser-included offenses; (5) instructed the jury to find Petitioner guilty of burglary; (6) omitted elements of the charged offenses from the instructions; (7) admitted inculpatory evidence disclosed for the first time during trial; (8) found sufficient evidence to find the allegations of Petitioner's prior convictions true; and (9) sentenced Petitioner to consecutive sentences based on facts not found by the jury beyond a reasonable doubt. Respondent argues that these claims are both procedurally barred and without merit.[3] The claims involving four of these alleged errors, numbers four through seven, were silently denied by the California Supreme Court. The Court will

---

[3]The procedural bar need not be addressed in light of the Court's determination that Petitioner's arguments fail on the merits.

independently review the record to determine if the denial of these claims was an unreasonable application of clearly established federal law. *See Pirtle*, 313 F.3d at 1167. The claims regarding the remainder of the alleged errors were denied on procedural grounds, such as timeliness. The Court shall review these claims *de novo*. *See id*.

### 1. Exclusion of Third-Party-Culpability Evidence

Petitioner claims his rights under the Fifth, Sixth and Fourteenth Amendments were violated by the trial court's exclusion of third-party culpability evidence. Respondent argues the evidence was properly excluded under California law.

It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Due process requires that a criminal defendant be given "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410. Evidence rules violate a criminal defendant's rights only if they "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation and internal quotation marks omitted). Trial judges have a "wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90 (citation and internal quotation marks omitted). In considering whether the exclusion of evidence violates due process, this court must consider the probative value of the evidence on the central issue. *United States v. Cruz-Escoto*, 476 F.3d 1081, 1088 (9th Cir. 2007). Finally, assuming exclusion was error, it is subject to harmless-error analysis. *Neder v. United States*, 527 U.S. 1, 18 (1999).

To be admissible under California law:

> third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in *Mendez*, evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

*People v. Hall*, 41 Cal. 3d 826, 833 (Cal. 1986).

Delena Robinson, Petitioner's wife/fiancee, testified that she was aware of "about eight" African-American adult males who had heard about the alleged sexual assault against her daughter, Jodee Landrum. RT 683-84. Of those eight men, Robinson indicated that two of them were similar in physical description to Petitioner. RT 684. When defense counsel asked Robinson for the names of those two men, the trial court did not let Robinson answer and, instead, held an unrecorded sidebar conference with counsel. RT 685. When the matter was back on the record, the court ordered the jury to disregard all of the aforementioned questions and answers about the eight men. RT 685. However, upon further reflection later that same day, the court modified its ruling in one respect; while the court still would not allow Robinson to name the two men, the court informed the members of the jury that they were free to consider the fact that these men were aware of the alleged sexual assault against Landrum. RT 756-757.

Petitioner sought to implicate the two other individuals based solely upon speculation that they shared Petitioner's motive as a result of being informed about the sexual assault on Landrum. Under California law, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt." *Hall*, 41 Cal. 3d at 833. As Petitioner had offered only attenuated evidence of motive, the trial court's refusal to allow introduction of the individuals' names was clearly consistent with California law. Such attenuated evidence had very little probative value, and its exclusion was neither arbitrary nor disproportionate to the state's interest in maintaining an orderly trial. Accordingly, the Court finds that the exclusion of the evidence did not violate either Petitioner's confrontation or due process rights.

### 2. Questions from the Jury

Petitioner argues that the trial court abused its discretion by allowing the jurors to ask questions of the victims in this case. In his traverse, Petitioner admits that the trial court actually questioned the witnesses after collecting written questions from the jury and reviewing the questions with counsel. Respondent submits this was not a violation of California law.

Petitioner has not identified, and the Court has not found, a holding of the Supreme Court finding the practice described to violate either the Constitution or any federal law applicable to the states. "It is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Given that the Ninth Circuit has held that such a procedure is not error, *United States v. Gonzales*, 424 F.2d 1055 (9th Cir. 1970), the Court finds that the circumstances in this case did not violate any of Petitioner's constitutional rights.

### 3. Assistance to the Prosecution

Petitioner argues the trial court assisted the prosecution on numerous occasions presenting the appearance of bias. Respondents argue that this claim fails because Petitioner failed to set out specific facts constituting his claim.

A trial court's conduct violates a defendant's right to a fair trial if that conduct has undermined the presumption of innocence. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976); *Maiden v. Bunnell*, 35 F.3d 477, 482-83 (9th Cir. 1994). On habeas review, a district court looks to whether the conduct was "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *See Holbrook v. Flynn*, 475 U.S. 560, 572 (1986).

In his application for relief, Petitioner failed to cite the record or recite the specific facts constituting his claim. Respondents correctly argue that conclusory allegations such as these are insufficient by themselves to warrant habeas relief. *See Jones*, 66 F.3d at 204. In his traverse, Petitioner points to two instances where the judge supplied a tape measure to facilitate making a clear record. These factual contentions are brought too late to be cognizable. *See* Section 2254 Cases, Rule 2(c)(2); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). However, even had the factual contentions been timely pled, the claim would still fail. The trial transcripts show that the trial court was merely quantifying witness-demonstrated distances for the record. There was nothing prejudicial or unfair about the trial court's conduct. Accordingly, the Court finds the trial court's conduct was not "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *See Holbrook*, 475 U.S. at 572.

### 4. Failure to Instruct on Lesser-Included Offenses

Petitioner contends that the trial court erred by failing to instruct on lesser-included offenses. However, Petitioner has failed to identify the lesser-included offenses that should have been included in the instructions. Unsupported by a statement of specific facts, this claim does not warrant habeas relief. *See Jones*, 66 F.3d at 204. The California Supreme Court's silent denial of this claim cannot be said to be an unreasonable application of clearly established federal law.

*5. Burglary Instruction*

Petitioner alleges the trial court erred by instructing the jury "that if you should find guilt as to [burglary], you are directed to find it to be burglary in the first degree." As there was no dispute over whether the apartment where the assaults took place was an "inhabited dwelling house," the trial court's instruction was not error. *See* Cal. Penal Code § 460(a) ("[e]very burglary of an inhabited dwelling house . . . is burglary of the first degree"). The California Supreme Court's silent denial of this claim cannot be said to be an unreasonable application of clearly established federal law.

*6. Omitted Elements*

Petitioner generally contends that the trial court omitted essential elements of the charged crimes from the jury instructions. "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *See Jones*, 66 F.3d at 204 (citation and internal quotation marks omitted). Nor has the Court's independent review of the record discovered any such omissions. The California Supreme Court's silent denial of this claim cannot be said to be an unreasonable application of clearly established federal law.

*7. Admission of Late-Disclosed Evidence*

Petitioner argues that the trial court's admission of late-disclosed inculpatory evidence violated his right to a fair trial. He further submits that the trial court's instruction regarding the tardy reports constituted vouching. Respondents argue that there was no violation of state law and therefore no violation of the federal Constitution.

"It is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). For the introduction of evidence to make a trial fundamentally unfair in violation of the Due Process clause, the evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). It is also a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). To support a collateral attack on the judgment, the question is "whether the

15

ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned.'" *Id.* at 147.

The California Court of Appeal addressed this claim on direct review:

Defendant next argues the trial court erred in refusing to exclude the two late police reports presented by the People and emasculated the jury instruction concerning the lateness of the discovery when the court advised the jury the court found "no bad faith . . . by the district attorney's office or law enforcement to keep these reports from the defense." We disagree.

Trial in this case commenced on January 2, 2001. Defendant requested discovery from the People beginning in November 2000. The People, however, failed to produce many pages of discovery in a timely manner. They produced pages 120-222 on December 7, 2000, pages 236-300 on December 12, 2000, pages 236-238 on December 20, 2000, pages 111-119, 223-235, 88-90, and 301-412 on December 28, 2000, and pages 413-434 on the first day of trial. After the trial commenced, the People produced pages 435-548 between January 3, 2001, and January 10, 2001. It was this last batch of discovery that contained a three-page report and an 11-page report prepared by Detective Cabral in September 2000. These reports contained evidence of defendant's flight when he was arrested, incriminating statements made by his girlfriend, Robinson, and damaging admissions made by defendant to his sister, Lofton.

Defendant brought a motion for sanctions for this late discovery asking for the exclusion of this evidence. In response to the trial court's question about whether a continuance would solve this issue, defendant argued this was an empty remedy because he had already sat in jail for five months. Defense counsel argued she was prejudiced by the late discovery because the defense had limited resources and needed time to evaluate and meet evidence such as that included in the discovery.

The court conducted a hearing pursuant to Evidence Code section 402 concerning Detective Cabral's reasons for failing to deliver the reports to the district attorney's office earlier. Detective Cabral testified the supplemental reports were completed in September of 2000, but he had no explanation as to why they were not turned over to the district attorney's office until January of 2001. Detective Cabral testified he did not purposefully fail to turn over these reports. At the conclusion of the hearing, the court found the police had not engaged in bad faith [Footnote 7] and stated it would allow some of the statements contained in the late discovery to be used as evidence. The court also asked the witnesses who gave the statements reflected in the late police report to cooperate and confer with defense counsel. As a discovery sanction, the court indicated it would give the jury the limiting instruction contained in CALJIC No. 2.28.

[Footnote 7: Even defense counsel did not argue this failure was intentional.]

"The obligation of the People to disclose information to the defense is dependent upon whether that obligation has a constitutional or statutory basis. As articulated by the United States Supreme Court in *Brady v. Maryland* (1963) 373 U.S. 83, the prosecution has a sua sponte obligation, pursuant to the due process clause of the United States Constitution, to disclose to the defense information within its custody or control which is material to, and exculpatory of, the defendant. (*E.g.*, *Kyles v. Whitley* (1995) 514 U.S. 419; *In re Ferguson* (1971) 5 Cal.3d 525.) This constitutional duty is independent of, and to be differentiated from, the statutory duty of the prosecution to disclose information to the defense. ( § 1054 *et seq.*; *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378.) The California statutory scheme, adopted

by initiative in 1990, requires that the prosecution disclose specified information to the defense, as set out in section 1054.1." (*People v. Bohannon* (2000) 82 Cal.App.4th 798, 804.)

Section 1054.1, in relevant part, states: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [P] . . . [P] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

Thus, by statute, the prosecution was obligated to disclose to defense counsel the reports at issue here. The disclosures must be made at least 30 days prior to trial (or if documents are discovered later, immediately) absent a showing of good cause. ( § 1054.7.) "'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." ( § 1054.7; *see People v. Hammond* (1994) 22 Cal.App.4th 1611, 1620.) Violation of these provisions may result in sanctions under section 1054.5. (*People v. Bohannon*, *supra*, 82 Cal.App.4th at p. 805.)

Here, the prosecution failed to comply with its statutory discovery obligations by delaying disclosure of the reports until after the first day of trial. The record further does not reveal any "good cause" for the late disclosure, nor does the record suggest deliberate or willful misconduct or an improper motive by the prosecution or law enforcement. The People's proffered excuse that the reports simply got lost does not amount to good cause. [Footnote 8]

[Footnote 8: We are troubled by the apparent cavalier attitude of the officer in testifying about how these documents should have gotten to the district attorney's office and his apparent lack of concern about this vital part of criminal prosecutions.]

Upon a showing that one party failed to comply with section 1054.1's disclosure obligations and that the moving party complied with the informal discovery procedure, a court may make any order necessary to enforce the provisions of the chapter. ( § 1054.5, subd. (b); *People v. Jackson* (1993) 15 Cal. 4th 1197, 1201-1202.) We will reverse the trial court's choice of a discovery sanction only if we find an abuse of discretion. (*See Jackson*, at p. 1203.)

The sanction of exclusion is available under the discovery statute only if the defense has demonstrated the violation of the discovery statute caused significant prejudice and was based upon willful conduct designed to obtain a tactical advantage. (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1757-1758.) "If the truth is to be served, the failure to disclose, at least where not willful, should not be punished by the suppression of evidence, but by giving the offended party a proper opportunity to meet the new evidence." (*People v. McRae* (1967) 256 Cal. App. 2d 95, 104, 63 Cal. Rptr. 854; accord, *People v. Gonzales*, *supra*, 22 Cal.App.4th at p. 1758.) Furthermore, "subdivision (c) of Penal Code section 1054.5 allows a trial court to preclude the testimony of a witness 'only if all other sanctions have been exhausted.'" (*People v. Edwards* (1993) 17 Cal.App.4th 1248, 1264.) "Such 'other sanctions' are described in subdivision (b) of section 1054.5 as 'including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness . . . continuance of the matter, or any other lawful order.'" (*People v. Hammond*, *supra*, 22 Cal.App.4th at p. 1625.) Defendant bears the burden of demonstrating that such alternative lesser sanctions was inadequate. *(See People v. Carpenter* (1997) 15 Cal.4th 312, 386-387, 935 P.2d 708.)

We conclude that the exclusion of the reports was not required in this case. Nothing in the record indicates that the prosecution's omission was a deliberate effort to gain a tactical advantage. Defense counsel did not argue and the record does not support any inference of willful misconduct by the prosecution or law enforcement. Thus, the exclusion sanction was unavailable.

As to the sanction the court imposed, we conclude it was proper. The trial court squarely addressed the prejudice of the admission of this late discovered evidence. Early in the case, defense counsel rejected the court's proffer of a short continuance to meet this evidence, which would have been the preferred method for dealing with this approximately 30-day delay in turning over these documents. Defendant cannot now argue he was impermissibly refused that opportunity midtrial. Faced with a tentative ruling that the court would not exclude the evidence, the trial court asked defense counsel what remedy she would request. Defense counsel asked the court to give the jury CALJIC No. 2.28 and defense counsel a short opportunity to confer with the witnesses who were the subject of these police reports. The trial court did what defense counsel requested; it gave the instruction and asked the witnesses to meet with and cooperate with defense counsel.

When Detective Cabral testified concerning these reports, the court told the jury: "Ladies and gentlemen, one of the issues that came up in the course of this case, as you probably detected from the last few questions, was two reports, . . . prepared by Officer, . . . Cabral regarding, . . . Ms. Robinson and Ms. Lofton, who previously gave statements to this officer. [P] Those reports did not materialize in the hands of the district attorney 'til after this trial began, which didn't leave me a happy camper, and I conducted proceedings outside your presence going into that issue. [P] I'm admitting those reports into evidence, and I found, in going through my own hearings without you here, that there was no bad faith or subterfuge or plan afoot by the District Attorney's Office or law enforcement to keep these reports from the defense. [P] However, the lateness of the reports is something that you can consider in weighing the prior statements and things that were referred to in the course of the report, but, please, understanding, don't impute any wrongdoing or nefarious conduct on the part of the district attorney or the Sheriff's Office about these reports. [P] It's a glitch that unfortunately happened and left the reports coming in very late for the defense, . . . I considered a continuance, but ascertained that would not be necessary, and you would be able to consider the lateness of the reports in weighing the credibility of the witnesses like you do all the other evidence in this case. [P] You'll get a specific instruction on these two reports in the Court's formal instruction packet, but I wanted you to learn a little bit about the issue, so when you hear questions by [counsel], you'll get some flavor." During closing instructions, the court reaffirmed this by reciting CALJIC 2.28. [Footnote 9] In addition, the trial court added the statement, "There is no evidence of intentional wrongdoing or bad faith on the part of law enforcement or the district attorney in failing to produce the two reports in a timely manner." The court informed the jury if law enforcement had followed its usual procedures, the reports would have timely been furnished to the prosecution and timely turned over to the defense.

[Footnote 9: The court instructed the jurors as follows: "In every criminal trial, there are discovery procedures by which the parties are required to share documents to be used at trial. Under normal discovery procedures, the People and the defense are required to disclose to each other, before the trial, the evidence each intends to present at trial so as to promote the ascertainment of truth, save court time, and avoid any surprise that may arise during the course of the trial.

"Delay in the disclosure of evidence may deny the other party sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the noncomplying party's evidence.

"Under discovery rules, disclosures of evidence are required to be made at least 30 days in advance of the trial. Any evidence discovered -- that is, any new evidence discovered within 30 days in advance of trial must be disclosed immediately.

"In this case, the trial began in this courtroom on January 3rd, 2001. The People did not disclose to the defense within 30 days prior to that date two written reports prepared by Detective Dan Cabral, one of the witnesses in this case.

"These two reports contained oral statements of two prosecution witnesses, Delena Robinson, given on September 15 of the year 2000, and Anita Lofton, given on September 19 of the year 2000. These reports were not provided to the defense until January 10th, 2001, which was after the trial began and seven days before the jury was sworn, which was January 17, 2001.

"There is no evidence of intentional wrongdoing or bad faith on the part of law enforcement or the district attorney in failing to produce the two reports in a timely manner; however, the Court has determined that, if the usual and proper procedures of law enforcement had been followed in this case, these two reports should have been furnished to the district attorney by law enforcement in a timely manner.

"Had law enforcement promptly provided them to the district attorney in September of the year 2000, the district attorney would then have been able to promptly share them with the defense, as required by criminal discovery rules, well before this trial began in January of 2001.

"Although the People's failure to timely disclose this evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial.

"The weight and significance of any delayed disclosure are matters for your consideration; however, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial, or subject matter already established by other credible evidence."]

While he did not do so at trial, defendant takes issue with the court's comments other than the CALJIC instruction itself. Given counsel's concession during argument that the failure to provide the reports was not intentional, and that she did not "intend to argue the People cheated in this case," we fail to see the harm in the court instructing the jury as to the facts found with regard to the lack of misconduct associated with the delay in producing this evidence.

Here, the jury was able to use the lateness of these reports to evaluate their value and the credibility of Detective Cabral -- the witness who produced them. Further, the jury heard both Lofton and Robinson testify about the inaccuracy of these reports and was able to judge their credibility as well. Defendant has failed to establish any error or prejudice based upon the court's ruling and instruction to the jurors.

*Rogers*, No. C038399, Slip op. at 13-22.

Petitioner has not supplied clear and convincing evidence that might refute the state court's

conclusion that the delay was not a result of bad faith. As neither the admission of the evidence nor

the instruction violated California law, Petitioner is hard-pressed to make out a due process violation. The Court cannot say that the decision of the Court of Appeal was an unreasonable application of clearly established federal law.

### 8. Sufficiency of the Evidence for the Prior Convictions

Petitioner contends the evidence was insufficient to allow the trial court to find true the allegation that he had been convicted of domestic violence in violation of California Penal Code § 273.5 with an allegation that he used a dangerous or deadly weapon pursuant to § 12022(b). Respondent argues the evidence was sufficient.

The constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). Because the Supreme Court of California denied this claim without a reasoned decision, this Court must independently review the record to determine if that denial was an unreasonable application of *Jackson*.

The record includes an abstract of judgment and a transcript of Petitioner's plea evidencing his admission of both domestic violence and the enhancement under § 12022(b). Any prior conviction for a felony offense, in which a defendant personally used a dangerous or deadly weapon, counts as a strike under California law. Cal. Penal Code §§ 667(a)(4), 1192.7(c)(23). The evidence was not just sufficient; it was overwhelming.

### 9. Consecutive Sentences

Citing *Apprendi v. New Jersey*, 530 U.S. 466, (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), Petitioner argues that he was sentenced to consecutive sentences in violation of the Sixth Amendment. This argument is foreclosed by the Supreme Court's recent decision in *Oregon v. Ice*, 129 S. Ct. 711, 714-15 (2009) (Sixth Amendment does not prohibit judges from finding facts in exercising their discretion to sentence a defendant to consecutive sentences).

### III. Ineffective Assistance of Appellate Counsel

Petitioner argues that his appellate counsel rendered ineffective assistance by (1) failing to raise all issues presented to the Court of Appeal in the petition to the California Supreme Court for review; and (2) failing to return the complete record to Petitioner. Respondent argues these claims fail on the merits. As these claims were silently denied by the California Supreme Court, this Court

must independently review the record to determine if such denial was an unreasonable application of clearly established federal law. *See Pirtle*, 313 F.3d 1167.

As discussed *supra*, to demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

The arguments omitted by appellate counsel are among those found here to be without merit. It is readily apparent that counsel was "winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, [such conduct] is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (citation and internal quotation marks omitted). Petitioner's conclusory allegation that appellate counsel withheld some portion of the record fails for lack of any specific facts as to either deficient performance or prejudice. *See Jones*, 66 F.3d at 204. Accordingly, this Court cannot find that the California Supreme Court's silent denial of this claim was an unreasonable application of clearly established federal law.

## IV. Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct denying him a fair trial in violation of the Due Process Clause. Respondents contend these allegations are both procedurally barred and without merit. As these claims were denied on procedural grounds, the Court must review them *de novo*. As none of Petitioner's arguments have merit, the Court declines to examine the procedural bar issue.

Prosecutors have a special duty as the representative of the State: "He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). A writ of habeas corpus will not issue for prosecutorial misconduct unless the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477

U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). In order to be entitled to habeas relief, a petitioner must demonstrate that he suffered actual prejudice because the prosecutor's comments had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 636.

### 1. Alleged Suppression of Arrest Warrant

Petitioner argues that the prosecutor's alleged suppression of the arrest warrant and the identity of a confidential informant who provided information leading to the warrant violated his rights to confrontation and due process. Petitioner has again failed to even allege what information the informant provided or why revelation of the informant's identity was legally required. Having failed to set out the specific facts supporting his conclusory allegations, Petitioner's claim fails. *See Jones*, 66 F.3d at 204.

### 2. Allegedly Suggestive Pretrial Identification

Petitioner alleges the pretrial photo six-pack lineup was unduly suggestive. Having failed to set out the specific facts supporting his conclusory allegations, Petitioner's claim fails. *See Jones*, 66 F.3d at 204.

### 3. Discovery Violation

Petitioner claims the prosecutor committed misconduct when he violated his statutory discovery obligations by failing to timely disclose Cabral's supplemental reports. Petitioner has failed to demonstrate that the late disclosure "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181. Nor has Petitioner shown actual prejudice. The Court of Appeal summarized it well:

> Here, the jury was able to use the lateness of these reports to evaluate their value and the credibility of Detective Cabral -- the witness who produced them. Further, the jury heard both Lofton and Robinson testify about the inaccuracy of these reports and was able to judge their credibility as well. Defendant has failed to establish any error or prejudice based upon the court's ruling and instruction to the jurors.

*Rogers*, No. C038399, Slip op. at 22.

### 4. Alleged Brady Violation

Petitioner reiterates his discovery and arrest warrant claims yet again, this time adding a conclusory allegation that the withholding of the reports and the identity of the confidential informant violated *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner has failed to recite any specific facts that would support his conclusory allegation that the reports and the confidential

22

informant had exculpatory evidence. *Brady* and its progeny are not implicated unless the information withheld was favorable to the accused. *See Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

### 5. Alleged Vouching and Tampering

Petitioner alleges that the prosecutor vouched for the credibility of Detective Cabral, Haro and Lindeman. Yet again, Petitioner has failed to recite any specific facts regarding vouching. Having failed to set out the specific facts supporting his conclusory allegations, Petitioner's claim fails. *See Jones*, 66 F.3d at 204. Petitioner also alleges that the prosecutor sought to influence the testimony of Delena Robinson and Chaliah Ware. Petitioner has failed to submit any evidence, such as affidavits, that might support these allegations. *See Dows*, 211 F.3d at 486.

### 6. Improper Argument

Petitioner argues the prosecutor committed misconduct by arguing for the first time during rebuttal that Petitioner had failed to present any alibi evidence. The Court of Appeal addressed this claim, concluding that it was proper rebuttal to Petitioner's defense that the victims had misidentified him. *Rogers*, No. C038399, Slip op. at 12-13. The Court agrees that the prosecutor did not commit error as his comments were permissible argument. Accordingly, with regard to this last prosecutorial misconduct claim, the Court cannot say that the decision of the Court of Appeal was an unreasonable application of clearly established federal law.

In conclusion, none of the circumstances identified by Petitioner either together or in isolation so infected the trial with unfairness that Petitioner's due process rights were violated.

### V. Cruel and Unusual Punishment

Petitioner contends that his sentence of 122 years to life violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Court of Appeal rejected this argument on the ground that the issue was not raised in the trial court. As the Court of Appeal did not reach the merits of this claim, this Court reviews the claim *de novo*. *See Pirtle*, 313 F.3d at 1167-68.

"[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Solem v. Helm,* 463 U.S. 277, 289-90 (1983) (internal alterations and emphasis omitted). Determination of prison sentences is a legislative prerogative not within the province of the courts. *Rummel v. Estelle*, 445 U.S. 263, 275–76 (1980). However, in rare cases extreme sentences can violate the Eight Amendment because they are grossly

disproportionate to the crime. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy Concurring); *Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994). The precise contours of gross disproportionality review are unclear. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). The Ninth Circuit's most recent offering on the subject looks to the methodology suggested in Justice Kennedy's Concurrence in *Harmelin* as it was the narrowest view of a majority. *Gonzalez v. Duncan*, 551 F.3d 875, 881 (9th Cir. 2008). Under that methodology, a court should first consider whether the offense and punishment "'leads to an inference of gross disproportionality.'" *Id*. (quoting *Harmelin*, 501 U.S. at 1006). Only if such an inference exists should a court "proceed with intrajurisdictional and interjurisdictional analyses," described in *Solem*.[4] *Id*.

The Court begins by examining the gravity of the offense and the harshness of the penalty to determine whether an inference of gross disproportionality exists. In the Summer of 2000, Petitioner forced his way into the victims' apartment with a pistol looking for the 13-year-old boy who had allegedly sexually assaulted his girlfriend's daughter the day before. Unable to locate the boy, Petitioner unleashed his wrath on those who were present: three women (one of whom was 78 years old) two children, and one man. Petitioner repeatedly struck the three women and lone man on the head and in the face with his pistol and threatened their lives. He drug one of the women a distance of roughly 30 feet by her hair. During this tantrum, Petitioner committed 14 felonies: one count of burglary, four counts of assault with a deadly weapon with an additional allegation that Petitioner inflicted great bodily injury, one count of kidnapping, four counts of criminal threats, one count of elder abuse, one count of false imprisonment, one count of obstructing a telephone, and one count of being a felon in possession of a firearm.

Prior to commission of the instant offenses, Petitioner had already established a history of violent conduct. The trial court found true beyond a reasonable doubt four allegations that Petitioner had been convicted of serious felonies qualifying as strikes under California's Three Strikes Law. The first three strikes were based on 1983 convictions for armed robbery and two counts of attempted murder. CAT 88-89; RT 1285-88. Those convictions stemmed from a home

---

[4]*Solem* called for examination of "objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Solem*, 463 U.S. at 292.

invasion robbery where Petitioner shot a male victim in the arm and face, and a female victim in her arm and neck. RT 1300-01. In 1992 Petitioner was convicted of domestic violence with a deadly weapon. CAT 89; RT 1288. In that incident he repeatedly struck his girlfriend with his fist, rammed her head into a wall, and struck her in the back of the head with a crutch. RT 1302. Her injuries necessitated her transportation to the hospital by ambulance. *Id.*

Taking into account the four strike offenses and the instant 14 felony convictions, the trial court sentenced Petitioner under the California Three Strikes Law to an aggregate term of 122 years to life: four consecutive 25-years-to-life sentences for the four assaults; four three-year enhancements for inflicting great bodily injury during each assault; and two five-year enhancements for his prior strikes. The trial court stayed the sentence for the convictions for elder abuse and false imprisonment, and imposed concurrent 25-year-to-life sentences for each of the remaining counts: burglary, kidnapping, four counts of criminal threats, obstruction of a telephone, and being a felon in possession of a firearm. *Rogers*, No. C038399, Slip op. at 9-10 n.6. Had the trial court made everything consecutive, Petitioner would have received a sentence of 325 years to life.

The sentence in no way raises an inference of gross disproportionality given Petitioner's conduct in this case and his history of violence. A quick comparison with *Rummel* and its progeny quickly reveals that Petitioner's sentence is not grossly disproportional. In *Rummel*, the Supreme Court rejected the argument that a life sentence with possibility of parole upon conviction of obtaining $120.75 by false pretenses violated the Eighth Amendment where the defendant's criminal history consisted solely of the fraudulent use of a credit card to obtain $80 worth of goods and passing a forged check in the amount of $28.36. *Rummel*, 445 U.S. at 265-66, 285. In *Solem* the Supreme Court found a sentence of life without possibility of parole upon conviction of uttering a no account check for $100 based on a criminal history of six nonviolent felonies violated the Eighth Amendment. *Solem*, 463 U.S. at 279-81, 303. In *Harmelin*, the Supreme Court upheld against an Eighth Amendment challenge a mandatory life sentence without possibility of parole upon conviction for possession of more than 650 grams of cocaine without consideration of mitigating factors, such as fact the defendant had no prior felony convictions. *Harmelin*, 501 U.S. at 961, 996. In *Lockyer*, the Supreme Court concluded that two consecutive 25-years-to-life sentences with the possibility of parole, imposed under California's Three Strikes law following two petty theft convictions with priors, did not amount to cruel and unusual punishment. *Lockyer*, 538 U.S. at 77.

Similarly, in *Ewing v. California*, 538 U.S. 11 (2003), the Supreme Court held that a sentence of 25-years-to-life imposed under California's Three Strikes law for felony grand theft of three golf clubs did not violate the Eighth Amendment, especially where the defendant had a long history of increasingly violent recidivism.

Petitioner's violent criminal conduct is well beyond the nonviolent thefts and drug offenses at issue in the Supreme Court's precedents. In short, the sentence in this case does not raise an inference of gross disproportionality and does not violate the Eight Amendment.

### CONCLUSION

Petitioner's application must be denied as his claims are without merit. Further, as no reasonable jurist could debate whether the petition should have been resolved in a different manner, the Court declines to issue a Certificate of Appealability.[5] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Petitioner's application for writ of habeas corpus is DENIED;

2. The Court declines to issue a Certificate of Appealability; and

3. The Clerk shall enter judgment accordingly.

Dated this the 26th day of March 2009.

/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
United States District Judge

---

[5] A district court may grant a certificate of appealability only if a petitioner makes a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 482 (2000) (internal quotation marks and citations omitted).